SCOTT YOUNG (10695)
SNOW CHRISTENSEN & MARTINEAU
10 Exchange Place, 11th Floor
Salt Lake City, Utah 84111
Telephone: (801) 521-9000
rsy@scmlaw.com
*Attorneys for Defendants*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| S. STEVEN MAESE,<br><br>Plaintiff,<br><br>vs.<br><br>SOUTH JORDAN CITY, OFFICER JOHNNY SERRANO, OFFICER ANDREW THOMPSON, AND OFFICER DOES 1-10,<br><br>Defendants. | **REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:21CV562<br><br>Judge Howard Nielson, Jr. |

## <u>INTRODUCTION</u>

Mr. Maese has alleged unreasonable searches of his home. The searches were initiated after Mr. Maese strangled and almost killed his ex-girlfriend on September 24, 2019. This Court has already ruled that the initial protective sweep was constitutional. The subsequent searches were performed after obtaining search warrants. Thus, no search violated either the Constitution. Even if there was a constitutional violation, qualified immunity applies and there is no evidence of a pattern of unconstitutional practices by South Jordan City. For these reasons, and others set forth below, summary judgment should issue.

## <u>REPLY TO MR. MAESE'S RESPONSES TO SOUTH JORDAN'S FACTS</u>

South Jordan responds to the facts Mr. Maese disputes - #10-#14, #19, #23:

1.    **<u>SJC – Fact #10:</u>** Before proceeding to Mr. Maese's home, Sergeant Kaer performed a criminal background check of Mr. Maese. They learned that he was anti-police and known to have weapons, as shown by the report below:



**Mr. Maese's Response:** In response to Paragraph 10, plaintiff disputes that "Sergeant Kaer performed a criminal background check of Mr. Maese [and] learned that he was anti-police and known to have weapons." The defendants have presented no evidence that a criminal background check was performed on Maese prior to his arrest. The database entry that defendants call a "criminal background check" appears to have been created or modified on or after November 13, 2020. Dkt 23-12. The database entry is inadmissible evidence. Defendant's cannot lay a foundation for the existence of the entry. It was doctored over a year after the incident, and is therefore irrelevant. The author of the entry is not a disclosed witness, and it is inadmissible hearsay that has repeatedly been offered for the truth of the matter asserted.

a)    Plaintiff specifically disputes that his being referenced as "known to have guns and anti-police" is an established fact. This indication from the officers' database gives rise to many disputed facts that cannot be supported by admissible evidence, as the Spillman entry is

irrelevant, hearsay, and the defendants have no foundation for their "knowledge." see FRCP 56(c)(1)(B). Mr. Maese must additionally be able to confront those responsible for the database entry under oath to determine additional material facts related to this issue.

b) The term "anti-police" is ambiguous and is not a valid reason to target a citizen. Maese has no criminal record. He has never been arrested or charged with any crime against the police. Maese disputes that the term "anti-police" was anything other than a comment on his political advocacy and political activities, and has no relevance to any danger that he posed to the defendants. This point could not be made with admissible evidence. see FRCP 56(c)(1)(B).

c) Defendant Thompson testified on March 22, 2022 that, prior to the protective sweep, "[none of the officers on the arrest scene] had seen the weapons in your home to know they were in your home." Thompson Depo 16. This statement flies in the face of the defendant's claim that the officers knew Maese had guns.

**SJC's Reply:** Mr. Maese's argument that "defendants have presented no evidence that a criminal background check was performed on Maese prior to his arrest" is incorrect. Sergeant Kaer testified, "While Officer Serrano was at the hospital, we performed a criminal background check on Mr. Maese. It revealed that Mr. Maese had an extensive history of criminal charges, he had an active protective order against him, he was anti-police, and he possessed firearms." Kaer Decl., Par. 8. Similarly, Officer Serrano testified, "While I was at the hospital, South Jordan Police Sergeant Travis Kaer stated over the radio that he had run a criminal background search of Mr. Maese and discovered he was anti-police and possessed firearms." Serrano Decl., Par. 10. Mr. Maese had the opportunity to question Sergeant Kaer and Officer Serrano about the criminal background check when he deposed them on March 2, 2022. Thus, their testimony is admissible

evidence of the criminal background check and its results.

Defendants concede that the have not laid sufficient foundation for the screen shot; however, this does not put the officers' testimony in dispute. Mr. Maese submits no evidence that it was "doctored," as he concludes. This conclusion is contradicted by admissible evidence from the night in question. First, Officer Thompson's body-camera footage of the incident shows him telling Mr. Maese that the officers were concerned because they knew he had weapons. *See* Thompson Depo., Par. 11, Exh. 1. Second, the police narratives written a few hours after the encounter confirm that the officers knew of these risk factors. Officer Serrano noted this in the police report he wrote on September 24, 2019 at 10:54 p.m. *See* SSM 125, Exh. 2, Serrano Decl., Exh. 3.[1] In it, he wrote, "There was also a concern due to the reported number of guns he was known to have. *See Id.* In addition, Ms. Adame checked "Yes" in response to the question, "Does he/she have a gun or can he/she get one easily?" on the Domestic Violence Lethality Screen for Law Enforcement she filled out on the night of the incident. *See* SSM 34, Exh. 4, Serrano Decl., Exh. 3.[2] Similarly, Officer Taylor Coburn wrote in his report, "Due to prior history with Santiago where he was known to have firearms and was anti-police, I assisted by watching the street north of the residence in case Santiago attempted to fle[e] out the back of his residence." *See* Exh. 5, SSM 71, Coburn Decl., Exh. 6.[3]

This evidence is not being submitted for the truth of the matter, but simply to show what the officers knew about Mr. Maese as they approached his home. *See U.S. v. Harris*, 735 F.3d 1187, 1191 (10th Cir. 2013) ("The Fourth Amendment requires us to evaluate the reasonableness of searches and seizures based on the facts known to officers when the event in question occurred,

---

[1] This document was produced by Mr. Maese, as it has his Bates stamp, SSM.
[2] This document was also produced by Mr. Maese.
[3] This document was also produced by Mr. Maese.

and to avoid as best we can the temptation of offering critiques with the "20/20 vision of hindsight.").  Even if the officers' knowledge as they approached Mr. Maese's home was mistaken, this does not render the search unconstitutional.  *See U.S. v. Cunningham*, 630 Fed.Appx. 873, 874 (10th Cir. 2015) (unpublished) ("The Supreme Court has long recognized that an officer's reasonable mistake of fact does not render a seizure, particularly a traffic stop, unconstitutional. Our cases do as well.").  Critically, however, Mr. Maese has not submitted any evidence putting the truth of Sergeant Kaer's or Officer Serrano's testimony about the background check in dispute. He has not submitted any evidence suggesting he did not have an outstanding protective order (he did), that he did not possess firearms (officers observed 24 firearms in his home during the protective sweep despite the protective order), that he did not have extensive history of criminal charges (he conceded this in his Interrogatory Responses, Exh. 7, and see *State v. Maese*, 2010 UT App 106, 236 P.3d 155 (Utah Ct. App. 2010)), or that he is not actually anti-police.

For these reasons, there is no dispute that the officers knew of these things when they went to his home in response to Ms. Adame's 911 call.

**SJC – Fact #11:** 11.  The officers also learned that Mr. Maese had an active protective order against him in another case, and that this protective order prohibited him from possessing weapons. See Protective Order, Dkt 23-13, see also Maese Depo., 55-57, Exhibit 1.

**Mr. Maese's Response:** In response to Paragraph 11, Plaintiff disputes that "The officers also learned that Mr. Maese had an active protective order against him in another case, and that this protective order prohibited him from possessing weapons." The protective order entered against him specifically excluded all weapons besides firearms from prohibition. Dkt 23-13. See also Maese Depo 57.

**SJC's Reply:** The protective order states, "Defendant is prohibited from purchasing, using, or possessing a firearm." Dkt 23-13.

**SJC – Fact #12:** The officers then went to Mr. Maese's home.  Officer Serrano described what occurred:

> I then responded to the address of 3892 W. Coastal Dune Drive with several other officers to make contact with the suspect Santiago Maese.  Maese came to the front door and acted very suspicious coming to the door and then walking away several times.  **There was also a concern due to the reported number of guns he was known to have**.  When Maese finally opened the door I pointed my rifle at him to ensure he did not have a weapon.  Once we established no weapon was present Maese was taken into custody without incident and transported to the station to get his statement and to complete our investigation.

**Mr. Maese's Response:** In response to Paragraph 12, plaintiff disputes that the officers "knew he had weapons", and that there were "a reported number of guns he was known to have." The database entry is not admissible evidence to demonstrate the officers' knowledge of what Mr. Maese possessed, see supra, p1. Furthermore, in that database entry there is no mention of guns or an objective number of weapons that he may have had, and these facts could not be proven with admissible evidence. Dkt. 23-12. see FRCP 56(c)(1)(B).

a) Defendant Thompson testified on March 22, 2022 that "[none of the officers on the arrest scene] had seen the weapons in your home to know they were in your home" Thompson Depo 16.

In response to paragraph 12(17), plaintiff disputes that Defendant Serrano "knew [Maese] had weapons." Plaintiff disputes that reading an inadmissible, unverified, internal database entry (created over a year after Maese's arrest) equates to knowledge. This fact could not be proven with admissible evidence. Supra p.1, see FRCP 56(c)(1)(B).

**SJC's Reply:** *See* Response to Fact #10. This evidence is admissible to show what information the officers had when they approached Mr. Maese's home.

**SJC – Fact #13:** After Mr. Maese was taken into custody, Officer Serrano testified, "We determined to conduct a protective sweep of the premises to ensure officer safety and to preserve evidence. We were concerned about safety because we did not know who, if anyone, was still in the home. According to Ms. Adame, she had only been in the entryway of the home and Mr. Maese had left the entryway after initially engaging the officers for several minutes. We were also concerned about safety because Mr. Maese was known to have firearms and be anti-police. We determined to have several officers wait at the home until we could obtain a search warrant, which left them in a vulnerable position. In addition to these safety issues, we were concerned about preserving evidence of the assault. Ms. Adame had told me that Mr. Maese had ordered her to clean up the mess, and we were unsure if he had asked someone inside to do this when he left the doorway before exiting the home." Serrano Decl., *Id.*

**Mr. Maese's Response:** In response to paragraph 13, plaintiff disputes that he was "known to have firearms and be anti-police." He was alleged to have "weapons," but nothing on the record suggests that the defendants had actual knowledge that Mr. Maese possessed firearms. Firearms are distinct from other weapons, as the protective order specifically allows Mr. Maese to possess other weapons. Dkt 23-13, see Supra p.1, see FRCP 56(c)(1)(B).

**SJC's Reply:** See Response to Fact #10 and #13.

**SJC – Fact #14:** The protective sweep lasted approximately five minutes and consisted of a search of the home for other individuals. The officers did not collect any evidence during the sweep, but made sure there was nobody else in the home and the evidence would be preserved. See Serrano Decl., *Id.*

**Mr. Maese's Response:** In response to paragraph 14, plaintiff disputes that the officers "did not collect any evidence during the sweep." The officers collected bodycam footage which was used as material evidence to obtain the September 27th search warrant. SSM 166-169, Exh. C. But for the evidence obtained by the protective sweep, the September 27th search warrant would likely never have been issued.

**SJC's Reply:** See Response to Fact #10-11.

**SJC – Fact #19:** 19. On September 27, 2019, at 4:29 p.m., Officer Sean Patrick Phillips submitted an Affidavit for Search Warrant for Mr. Maese's home that stated, in part:

> Steven was identified as Santiago Steven Maese (12/06/1976). It is know to Law Enforcement that Maese lives at 3892 W. Coastal Dune Dr. as South Jordan Police has responded to the location on other calls. I looked the above listed address on the Salt Lake County Assessors website, and it lists the owner of this house as S.S. Maese.

> Officers were advised, by Dispatch, that Steven had many firearms in the home. Officers took Steven into custody as part of the aggravated assault investigation. Officers cleared the home after taking Steven into custody. During that protective sweep for additional persons in the home, the officers encountered two closets that had firearms in them and a large locked gun safe in the basement of the residence.

> While investigating the aggravated assault, I found an active Pretrial Protective Order issued in South Jordan by the Justice Court stating Santiago Steven Maese was a weapons restricted person. The pretrial protective order, states in Conditions, condition number 4 which reads as "NO Guns or Other Weapons: The Court Having found that Defendant's use or possession of a weapon may pose a serious threat of harm to the alleged victim, the []. I also found a civil stalking injunction served to Santiago Maese. The Injunction was issued and served to Steven by the 4th District Court Honorable James R. Taylor, on 8/14/2017 (Court case #170400774). Showing a pattern of this behavior.

> Noting the active pre-trial protective order, I reviewed the body worn cameras of two officers and found that video of a shotgun and an AR-15 had been recorded during their protective sweep of the home. I noted that as they observed the weapons, they verbally warned each other as they observed additional handguns and AR-15 rifles that were not in the camera view.
> Defendant is prohibited from purchasing, using, or possessing a firearm or any of the following weapons:" The Protective Order was issued and served to Steven in the courtroom by the Honorable Michael Boehm, on 8/29/2019 (Court case #191800378).

This affidavit has been reviewed by Zimmerman of the 3rd District Office, and it has been approved for presentation to the court.

SSM 166-169, Exh. C.

**Mr. Maese's Response:** In response to paragraph 14, plaintiff disputes that the officers "did not collect any evidence during the sweep." The officers collected bodycam footage which was used as material evidence to obtain the September 27th search warrant. SSM 166-169, Exh. C. But for the evidence obtained by the protective sweep, the September 27th search warrant would likely never have been issued.

**SJC's Reply:** See Response to Fact #11.

**SJC – Fact #23:** 23. Magistrate Judge Romero issued a Report and Recommendation in which she recommended denying the Plaintiff's Partial Motion for Summary Judgment. Specifically, she found:

- "The only issue presented by the moving party, Mr. Maese, is whether Officer Serrano violated the Fourth Amendment by leading the protective sweep within Mr. Maese's home." (Dkt. #50, p. 5)

- "[T]he evidence [Mr. Maese] provided to the court supports that this was a protective sweep which is permissible in the United States pursuant to Maryland v. Buie, 494 U.S. 325." (*Id.*, p. 6)

- "[I]ndependent of any of the facts raised by Defendants in relation to their qualified immunity arguments, the facts Mr. Maese relies on in his motion are inadequate under the existing law to establish that the protective sweep was unconstitutional. Rather, the facts he relies on to support a contrary finding, that the search was a protective sweep." (*Id.*, p. 7)

- "The court notes for the parties that it has not addressed Defendants' qualified immunity arguments … The court anticipates Defendants will raise those arguments in their own motion for summary judgment when dispositive motions are due in December 2022. (*Id.*, p. 7).

Report and Recommendation issued June 15, 2022 (Dkt. #50).

**Mr. Maese's Response:** In response to paragraph 23, plaintiff disputes that partial summary judgment was ever sought against any defendant other than Johnny Serrano. Dkt. 50.

**SJC's Reply:** Undisputed.

### <u>SOUTH JORDAN'S RESPONSE TO MR. MAESE'S STATEMENT OF FACTS[4]</u>

**<u>FACT #9:</u>** The defendants arrested Mr. Maese outside of his home. Dkt 23-3 Ex 3., 14:15-19:40

**Response**: Undisputed.

**<u>FACT #10:</u>** Maese was cooperative with the police and was arrested without incident. Mr. Maese followed all orders of the police throughout his questioning and apprehension. *Id.*

**Response**: Disputed.  Mr. Maese was ultimately arrested without incident; however, prior to exiting his home, he ignored orders to exit twice and retreated into the home. He also was not truthful when he told the police he did not possess any firearms.

13.   Officer Thompson took the lead on contacting Mr. Maese, and he testified:

> 7.      Per our tactical plan, an officer was tasked with attempting to call Mr. Maese on the telephone to see if he would voluntarily exit the home. This was determined to be the safest approach because it would not require officers to approach the home.
>
> 8.      We called Mr. Maese several times, for approximately 10 minutes, but he did not pick up.
>
> 9.      We then determined to approach the home and call out to Mr. Maese.
>
> 10.      I approached the front door with Officer Serrano.  I rang the doorbell several times and I also loudly announced that we were "South Jordan Police.  Come to the door" and similar statements.  *Id.* at Exh. 3 (DEF-000705, beginning at approximately 14:15).

---

[4] Mr. Maese's Statement of Additional Facts starts at #9, hence the numbering.

11.     Eventually, Mr. Maese came to the door, but he did not open it.  He asked why we were there, and I told him that we wanted to talk to him about what had happened that night and that we were concerned because we knew he had weapons.  He responded that he didn't have any weapons.  *Id.* beginning at approximately 15:10.

12.     Mr. Maese then asked if he was going to be arrested, to which I responded, "We need to speak to you before we arrest you," and he said he was going to get a shirt and shorts.  *Id.* beginning at approximately 15:45.

13.     Per our training, we positioned ourselves away from the door and waited for Mr. Maese to return to the door.  We did this because doors and windows present the most likely areas of attack, and we could not see what Mr. Maese (or anyone else) was doing inside the home.

14.     After approximately two minutes, Mr. Maese said something at the door and I asked him to hustle up because he was making me nervous.  *Id.* beginning at approximately 18:00.

15.     He then cracked the door and said, in part, "I don't have any weapons.  No weapons.  I got my cell phone that's it.  Nothing.  I promise.  I'm not trying to die.  I'm not trying to get killed tonight.  Believe me.  This guy's got an AR.  I'm not going to mess with you guys.  I just got a feeling I'm going to go to jail so I'm gonna go pee before I," to which Officer Serrano responded, "Let's go do it." *Id.*  beginning at approximately 18:07.

16.     Mr. Maese then closed the door and the officers observed him go back upstairs in the home.  *Id.* beginning at approximately 18:38.

17.     This sequence of events was highly concerning because we knew he had weapons and an outstanding protective order, that he was anti-police, and that he had violently assaulted Ms. Adame.  We also knew that Ms. Adame had only been in the entryway, and we did not know if there was anyone else in the home.  Because of this, we retreated to the garage area temporarily for safety.

18.     Mr. Maese came back to the door approximately one minute later and exited the home.  *Id.* beginning at approximately 19:38.

19.     Mr. Maese complied with orders to show his hands and was taken into custody without incident.  *Id.* beginning at approximately 19:40.

*See* Dkt 54, ¶¶13-19.

-11-

**FACT #11:** Mr. Maese had been escorted off his property before defendants initiated the protective sweep. *Id.* See Dkt. 13, Exh D

>**Response**: Undisputed that Mr. Maese had been arrested outside of his home before the protective sweep was initiated.  It is unclear if he was "off his property."

**FACT #12:**  Officer Thompson testified on March 2, 2022 that "[he] took [Maese] into custody and left (the scene) before the officers even made that decision to do the protective sweep." Thompson Depo. Dkt. 60, 33, see Id, 36.

>**Response**: Undisputed that Officer Thompson testified as quoted.

**FACT #13:**  Adame forced her way into Maese's home by punching him in the face. Dkt 54-2 Maese Depo Vol 1 Exh A. 78,79. See also Ring Doorbell Cam, Dkt. 12-1. She left a cut on his nose, and knocked a tooth out of his mouth. DEF000794-796 Exh. B. See Serrano Depo. Dkt 60, 19.

>**Response**: Disputed that Ms. Adame "forced her way into Maese's home."  The Ring doorbell video speaks for itself.  Undisputed that Ms. Adame hit Mr. Maese, left a cut on his nose, and knocked a tooth out of his mouth.

**FACT #14:**  In preparing a supplemental narrative of the events of September 24, 2019, Officer Phillips, who was at the scene, recommended 2nd-degree felony burglary charges against Ms. Adame based on her forced entry into Maese's home and her injuring him in an assault. Dkt. 13, Exh C.

>**Response**: Disputed.  There is no indication in Sergeant Phillips narrative that the charges he recommended against Ms. Adame were "based on her forced entry into Maese's home." *See* Dkt. 13, Exh. C.

**Response**: Undisputed.

**FACT #16:** Before initiating contact with Mr. Maese, and after Maese was escorted from the property, Officer Serrano saw no activity in the home. Serrano Depo. Dkt. 60, 7-9.

**Response**: Disputed.  Officer Serrano's testimony on p. 7-9 of his deposition does not support this assertion.

**FACT #17:**  Officer Serrano could give no specific reason why he would have believed there was another person in the home at any point in the encounter with Mr. Maese. Serrano Depo 8-10.

**Response**: Disputed.  Officer Serrano's testimony on p. 8-10 of his deposition does not support this assertion.

**FACT #18:**  Sergeant Travis Kaer, who ordered the protective sweep, saw no activity in Maese's home to lead him to believe there was another person in the home and could give no specific reason why he believed that there could be another person in the home at any point in the encounter with Mr. Maese. Kaer Depo. Dkt 62, 8-10, 19.

**Response**: Disputed.  Sergeant Kaer's testimony on p. 8-10, 19 of his deposition does not support this assertion.  Moreover, when asked what specifics led him to believe someone else was in the home, Officer Kaer testified, "Due to the immense damage done to our victim and the type of crime and investigation of a horrendous domestic leading into the uncooperativeness and inability to be able to contact the individual through the most – lowest and most safest means, by phone, and in the preservation of the life and the preservation of the scene, yeah, I think I had a lot of information there I didn't have answers to.  And to verify and to make sure that my officers are safe, that my public is safe, and that the scene is secured and evidence is maintained until investigations can come."  Kaer Depo., p. 19; see also Kaer Decl., Par. 8-11.

**FACT #19:** Defendant Andrew Thompson, who arrived at the scene prior to Maese's arrest, testified that he did not observe anything that would lead him to believe there was another person in Maese's home at the time of his arrest. Thompson Depo, 14.

    **Response**: Undisputed.

**FACT #20:** Officer Serrano stated that a reason the defendants performed a protective sweep was that "[the defendants] did not know who, if anyone, was still in the home." Serrano Decl, Dkt 23-3, 25.

    **Response**: Disputed. Mr. Maese has taken the quoted statement out of context. For Officer Serrano's full statement, please see Dkt 23-3, Par. 15-28.

**FACT #21:** Officer Serrano stated "I don't know. There's a possibility for people to be [in a suspect's house at any time]" in response to a question asking if he had a reason to believe anyone else was in the home after Maese was arrested. Serrano Depo, 9-10.

    **Response**: Undisputed.

**FACT #22:** Officer Serrano stated that a reason for performing the protective sweep was because "[the defendants] were concerned about preserving evidence of the assault." Serrano Decl. 25.

    **Response**: Disputed. Officer Serrano's statements in his declaration are incomplete. For Officer Serrano's full statement, please see Dkt 23-3, Par. 15-28.

**FACT #23:** The officers performing the protective sweep entered Mr. Maese's home. The officers went into several rooms of the home and trespassed on all three floors. Dkt 23-3 Exh. 3, Dkt 13 Exh. D.

    **Response**: Undisputed that the officers performing the protective sweep entered Mr. Maese's home and went into several rooms. Disputed that the officers "trespassed on all three

floors." This is a legal conclusion, not a fact.

**FACT #24:** During the protective sweep, the defendants attempted to open a gun safe that was located in Maese's basement. Dkt 23-3 Exh. 3, see SSM 166-169 Exh. C.

**Response**: Disputed. The video recording of the protective sweep speaks for itself.

**FACT #25:** The officers used evidence gathered in the protective sweep to obtain probable cause for the September 27 warrant to search Maese's home. SSM 166-169, Exh C.

**Response**: Disputed. The probable cause affidavit shows the protective sweep was not used to gather evidence and that Ms. Adame's battered appearance, statements that Mr. Maese beat and strangled her, and the doctor's confirmation of the assault provided probable cause.

**FACT #26:** Mr. Maese had no criminal convictions on September 24, 2019. Dkt. 13, Exh C.

**Response**: Disputed. Mr. Maese had an open protective order against him and had multiple prior criminal convictions, including a conviction of one count of pattern of unlawful activity and four counts of exploiting prostitution. *See State v. Maese*, 2010 UT App 106, 236 P.3d 155 (Utah Ct. App. 2010).

**FACT #27:** The defendants use an internal police database ("Spillman", or "CAD System") to make notes about people they may have interacted with. See Dkt 23-12. See also Thompson Depo, 11-12.

**Response**: Disputed. Officer Thompson's testimony on p. 11-12 of his deposition does not state this.

**FACT #28:** The Spillman database is not a background check, and its entries are not subject to oversight. *See Id.*

**Response**: Disputed. Officer Thompson's testimony on p. 11-12 of his deposition does not state this.

**FACT #29:** A Spillman entry, appearing to be authored by either "Sgt. Whatcott" or "Lin" was used as a basis for performing a protective sweep on Maese's home. See Dkt. 23-12, Serrano Decl.

**Response**: Irrelevant. Disputed. The document was not the basis for performing the protective sweep. This is addressed in detail in Defendants' Reply to Fact #10.

**FACT #30:** No officer or employee of the defendant named "Sgt. Whatcott" or "Lin" has been disclosed in initial or subsequent disclosures by the defendants. See Dkt. 15-3.

**Response**: Irrelevant. Undisputed.

**FACT #31:** Notes in defendants' disclosed Spillman entry concerning Maese appear to have been entered on 11/30/2020, over a year after the events in question. Dkt 23-12.

**Response**: Irrelevant. The document speaks for itself.

**FACT #32:** Officer Serrano stated that the defendants used information from the Spillman entry for the plaintiff in deciding the propriety of the protective sweep, stating that "Mr. Maese was known to have firearms and be anti-police." Serrano Decl.

**Response**: Disputed. Officer Serrano testified, "While I was at the hospital, South Jordan Police Sergeant Travis Kaer stated over the radio that he had run a criminal background search of Mr. Maese and discovered he was anti-police and possessed firearms." Serrano Decl., Par. 10.

**FACT #33:** Mr. Maese moved for partial summary judgment against defendant Serrano on December 26, 2021. See Dkt. 13.

**Response**: Undisputed.

**FACT #34:** Discovery was completed on November 30, 2022. See Dkt. 12.

      **Response**: Undisputed.

**FACT #35:** The defendants did not file a counter-motion for summary judgment contemporaneous with their response to plaintiff's Motion for Partial Summary Judgment. Dkt. 15.

      **Response**: Undisputed.

**FACT #36:** Plaintiff's Motion for Partial Summary Judgment was denied, with the court finding that "Mr. Maese disputes material facts, as a result the court must deny [the] Motion for Summary Judgment. See Dkt. 50

      **Response**: Undisputed; however, Mr. Maese omits the entirety of the Court's holding, which continues: "<u>Further</u>, independent of any of the facts raised by Defendants in relation to their qualified immunity arguments, <u>the facts Mr. Maese relies on in his motion are inadequate under the existing law to establish that the protective sweep was unconstitutional." *Id.* (Emphasis added).

**FACT #37:** Defendants, between the time of Maese's arrest and the commencement of the protective sweep, made no audible mention of the "preservation of evidence." Dkt 23-3 Exh 3, 19:40-21:33. See also Kaer Depo, 36-37.

      **Response**: Undisputed.

**FACT #38:** Defendant Travis Kaer testified that authentic staff meeting notes from the South Jordan Police Department from Nov. 12, 2019 determined that a 4th Amendment violation had occurred, and the charges against Maese would be dismissed as a result. Kaer depo, 26-28.

      **Response**: This fact is irrelevant, immaterial, and misstates testimony.  Disputed. Sergeant Kaer testified he did not know who made the statement. *See Id.*

**FACT #39:** Defendant Kaer testified on March 2nd, 2022 that he has never been disciplined by SJPD for a civil rights violation, nor has he heard of any other officers ever being disciplined for such a violation. Kaer Depo, 39.

  **Response**: This fact is irrelevant and immaterial.  Undisputed.

**FACT #40:** Defendant Thompson testified on March 2, 2022 that he had no knowledge that himself or any other officers had been disciplined for any civil rights violations. Thompson Depo, 26-27.

  **Response**: This fact is irrelevant and immaterial.  Undisputed.

**FACT #41:** Defendant Serrano testified on March 2, 2022 that, to his knowledge at the time, neither he nor anybody in the department has ever been disciplined for violating someone's civil rights. Serrano Depo, 20, 24.

  **Response**: This fact is irrelevant and immaterial.  Undisputed.

**FACT #42:** Defendant Thompson testified on March 2, 2022 that in 2007 he was disciplined by South Jordan for dishonesty related to his reasons given for being late to work. Thompson Depo, 21-22. Thompson also testified that he was terminated from the department at some point between Sept 2019 and March 2022 for taking sick leave after an injury. Thompson maintained that his leave was approved by his doctor, but the department found it unreasonable nonetheless, and terminated him. Thompson Depo, 20-21.

  **Response**: This fact is irrelevant and immaterial.  Undisputed.

## ARGUMENT

### I. MR. MAESE HAS WAIVED SEVERAL CLAIMS.

"Failure to raise an issue on summary judgment constitutes waiver of that issue … The rule applies not only to the failure to raise issues at trial, but also the failure to raise issues on summary

judgment or in opposition to a motion for summary judgment." *Asia Strategic Investment Alliances, Ltd. v. General Electric Capital Services, Inc.*, 166 F.3d 346, (10th Cir. 1998) (unpublished).

Mr. Maese argues the September 25th search was invalid because the warrant affidavit did not state there was probable cause to charge Ms. Adame with crimes, and the September 27th search was invalid because the officers "recklessly omitted the material facts that they had no valid reason to perform the protective sweep." Dkt. 63, p. 30. Defendants address these arguments below; however, Mr. Maese has waived any other arguments that these searches were unconstitutional. Mr. Maese has also waived his claims under the Utah Constitution, as he has not addressed them in his opposition memorandum.

## II.    THE LAW OF THE CASE DOCTRINE PRECLUDES RE-LITIGATION OF THE PROTECTIVE SWEEP.

Generally, "once a court decides an issue, the same issue may not be relitigated in subsequent proceedings in the same case." *Grigsby v. Barnhart*, 294 F.3d 1215, 1218 (10th Cir.2002). The doctrine is subject to three exceptions: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice." *Id.*, 1219, n. 4. The Tenth Circuit views "these exceptions narrowly, requiring district courts to apply the law of the case unless one of the exceptions specifically and unquestionably applies." *Wessel v. City of Albuquerque*, 463 F.3d 1138, 1143 (10th Cir. 2006) (citations omitted).

Mr. Maese argues that the first exception applies because he filed his prior summary judgment motion before significant discovery had occurred, specifically, before he received the

Staff Meeting Minutes from 2019 that contain the statement, "Maese Case: we are going to lose all gun charges due to protective sweep being a violation of the 4th Amendment" (Def. 874). The exception, however, does not apply because Mr. Maese had the Staff Meeting Minutes long before the summary judgment order. The Tenth Circuit has made clear that "[t]he exception does not apply, however, where 'the additional evidence provided at the supplemental hearing was evidence the proponent had in its possession, but failed to produce, at the time of the original hearing.'" *Wessel*, at 1143-1144 (citations omitted). While it is true that the staff meeting minutes were produced after Mr. Maese filed his reply in support of summary judgment [Mr. Maese filed his reply on January 27, 2022 (Dkt. 26) and Defendants produced the document 12 days later in response to discovery requests, on February 8, 2022, Exh. 8, Mr. Maese had the document for four months before the Magistrate Judge issued her report and recommendation, and six months before the district judge adopted the report and recommendation. Mr. Maese even questioned Sergeant Kaer about them in his deposition on March 2, 2022. *See* Kaer Depo., p. 28-29. Despite this, Mr. Maese did not provide this information to the magistrate judge before she issued her Report and Recommendation, and he did not submit it in an Objection to the Report and Recommendation. Therefore, this exception to the law of the case doctrine does not apply.

The exception also does not apply because the Staff Meetings Minutes are inadmissible hearsay, not evidence or a legal holding that is binding on this Court. Mr. Maese questioned Sergeant Kaer about the author in his deposition and Sergeant Kaer responded that he did not know who made the statement. *See* Kaer Depo., p. 28. Sergeant Kaer speculated that it may have been Lieutenant Pennington or Sergeant Phillips *(see Id.*, p. 29), but Mr. Maese chose not to depose either of them. Thus, there is no evidence establishing who made the statement. There is also no evidence about what the author knew about the search, whether that information was complete, or

whether the statement was a final determination.  Without such information, this statement is inadmissible.  And even if the statement was admissible, it does not bind this Court. Mr. Maese has cited no law requiring this Court to adopt the legal conclusion voiced by a police officer in a staff meeting.  Thus, the Staff Meeting Minutes do not trigger the exception to the law of the case doctrine.

Mr. Maese next argues that the law of the case doctrine does not apply because he only sought summary judgment against Officer Serrano.  This argument fails because the law of the case doctrine precludes relitigation of an issue.  *See Grigsby v. Barnhart*, 294 F.3d 1215, 1218 (10th Cir.2002) ("[O]nce a court decides an issue, the same issue may not be relitigated in subsequent proceedings in the same case.").  Mr. Maese already litigated, and this Court already decided, whether the protective sweep violated the Constitution.  Moreover, Officer Thompson – the only individual defendant other than Officer Serrano – did not participate in the protective sweep, so there is no basis to hold him liable for this claim in the first place.

### III.    OFFICERS SERRANO AND THOMPSON ARE ENTITLED TO QUALIFIED IMMUNITY.

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established."  *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009).

### A.  The Protective Sweep did not Violate the Fourth Amendment.

The Supreme Court recently provided guidance on Fourth Amendment violations in *Distr. of Columbia v. Wesby*, 138 S.Ct. 577 (2018).  In *Wesby*, the Supreme Court reversed a denial of qualified immunity, finding that the warrantless arrests of partygoers suspected of trespassing

-21-

during spring break did not violate the Fourth Amendment.  The Supreme Court highlighted two

errors in the lower court's analysis:

> [T]he panel majority failed to follow two basic and well-established principles of
> law.  First, the panel majority viewed each fact 'in isolation, rather than as a factor
> in the totality of the circumstances.' … Second, the panel majority mistakenly
> believed that it could dismiss outright any circumstances that were 'susceptible of
> innocent explanation.'

*Id.*, at 588 (citations omitted).

The protective sweep here did not violate the Constitution because it was justified by

exigent circumstances and the need to preserve evidence.  The Tenth Circuit has held:

> In risk of personal danger cases, the basic aspects of the exigent circumstances
> exception are (1) the officers must have reasonable grounds to believe that there is
> an immediate need to protect the lives or safety of themselves or others; (2) the
> search must not be motivated by an intent to arrest or seize evidence; and (3) there
> must be some reasonable basis, approaching probable cause, to associate the
> emergency with the place to be searched.

*U.S. v. Thomas*, 372 F.3d 1173, 1177 (10th Cir. 2004) (citations omitted) (emphasis added).

The officers had reasonable grounds to believe there was an immediate need for protection

because (1) Ms. Adame presented with evidence of a violent assault, (2) Mr. Maese had an

outstanding protective order against him, and it prohibited him from possessing firearms, (3) the

officers were aware that Mr. Maese possessed firearms, (4) the officers were aware that Mr. Maese

was anti-police and had a significant criminal history, (5) after engaging the officers, Mr. Maese

ignored two orders to exit the home, and instead retreated to areas of the home the officers could

not see, where he could have been planning an ambush with someone or cleaning evidence, (6)

Mr. Maese told the offices he did not have any firearms, which contradicted the information the

police had and ultimately turned out to be untrue, and (7) Mr. Maese was able to conduct counter-

surveillance through this Ring Doorbell camera.  Based on the totality of these factors, there was a basis to conduct a brief, protective sweep to ensure safety and the preservation of evidence.

Mr. Maese argues the protective sweep was unconstitutional because the officers did not have any information suggesting anyone else was in the home.  He relies on three cases; however, they are distinguishable for the reasons set forth below.

### i.    *Buie*

In *Maryland v. Buie*, 494 U.S. 325 (1990), the Supreme Court held:

> We agree with the State, as did the court below, that a warrant was not required. We also hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.  Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual to those on the arrest scene.

*Id.*, at 334.  In *Buie*, the police executed an arrest warrant at Buie's home two days after an armed robbery.  They arrested Mr. Buie after he came up from the basement and then they searched the basement.  Specifically, the Supreme Court noted, "Thereafter, Detective Joseph Frolich entered the basement *'in case there was someone else'* down there." *Id.*, at 328 (emphasis added).  In this circumstance, the Supreme Court "conclude[d] that by requiring a protective sweep to be justified by probable cause to believe that a serious and demonstrable potentiality for danger existed, the Court of Appeals of Maryland applied an unnecessarily strict Fourth Amendment standard." *Id.*, at 336-337.

Like the officer in *Buie*, the officers here also conducted a protective sweep "in case someone else" who posed a danger was in the home.  In *Buie*, the crime at issue was an armed robbery.  Here, Mr. Maese had just beaten and strangled Ms. Adame, and the police had

information that Mr. Maese possessed firearms and was anti-police. The only difference between *Buie* and the present facts is that Mr. Maese was arrested after he exited his home. However, the Tenth Circuit has held that police may conduct protective sweeps even if the arrest occurs outside of the home. *See U.S. v. Banks*, 884 F.3d 998, 1014 (10th Cir. 2018) ("Although it is true that *Buie* involved an in-home arrest, courts have recognized that the same exigent circumstances present in *Buie* can sometimes accompany an arrest outside of a residence or other structure."). Moreover, the threat firearms pose to officers is significant both inside and outside of the home. In fact, the threat may be greater when police are outside the home because they cannot see an individual preparing to shoot or take cover behind walls, furniture or the like. Here, the police observed the results of Mr. Maese's brutal beating of Ms. Adame. They had information that Mr. Maese possessed firearms and was anti-police. These facts increased the potential danger and gave rise to an inference that Mr. Maese was communicating with someone in the home when he retreated from the door into the interior.

### ii.    *Nelson*

*Nelson* is distinguishable because it did not involve a crime of violence, the presence of firearms, a suspect who was anti-police, or a suspect who ignored multiple police orders and retreated to places he could not be seen. To the contrary, "[w]hile Nelson was serving a term of supervised release, his probation officer obtained an arrest warrant based on Nelson's alleged failure to comply with several conditions of that release." *U.S. v. Nelson*, 868 F.3d 885, 887 (10th Cir. 2017). In addition, there is no evidence that the police in *Nelson* believed or knew the parole violator to be anti-police. Moreover, the suspect did not ignore police orders and retreat into unknown parts of the home, as Mr. Maese did. Rather, "[f]rom the top of the stairs, [Officer] Thibault shouted commands for the unidentified person to come out and show his hands. After

-24-

ten seconds of shouting, Nelson came around the corner with his hands in the air. [Officers] Thibault and Owens instructed Nelson to walk up the stairs to the second level and placed him in custody there." *Id.*, 888. Each of these differences made the present situation exponentially more dangerous to the police officers. Therefore, *Nelson* does not establish that the protective sweep in these circumstances violated the Constitution.

### iii.    Bagley

*Bagley* also involved a violation of supervised release, not a crime of violence. *See U.S. v. Bagley*, 877 F.3d 1151, 1153 (10th Cir. 2017) ("Mr. Bagley is a convicted felon who was named in an arrest warrant for violating the terms of his supervised release."). *Bagley* did not involve firearms, nor was there any indication that the arrestee was anti-police. Thus, *Bagley* is also distinguishable from the present case.

### B.    It was not "Clearly Established" that the Protective Sweep violated the Constitution.

Even if the Court reconsiders the issue and determines that a constitutional violation occurred, the officers would be entitled to summary judgment because it was not clearly established at the time. The Supreme Court discussed this in detail in *Distr. of Columbia v. Wesby*, 138 S.Ct. 577 (2018). It stated:

> We have stressed that the "specificity" of the rule is "especially important in the Fourth Amendment context." *Mullenix*, supra, at 308 … Thus, we have stressed the need to "identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment." *White v. Pauly*, 580 U.S. ——, —— –, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (per curiam ); *e.g., Plumhoff*, supra, at 2023. While there does not have to be "a case directly on point," existing precedent must place the lawfulness of the particular arrest "beyond debate." *al– Kidd*, supra, at 741, 131 S.Ct. 2074. Of course, there can be the rare "obvious case," where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances. *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d.

*Id.*, at 589-590 (citations omitted).

As set forth above, *Buie*, *Nelson* and *Bagley* are distinguishable because they did not involve crimes of violence and perpetrators known to be anti-police and possess firearms. They also did not involve homes where the perpetrator (or anyone else in the house) could conduct surveillance via the Ring Doorbell camera. They also did not involve the suspect ignoring police orders to surrender and retreating into rooms the police could not see. Thus, they do not "clearly establish" a violation in these circumstances.

Two other Tenth Circuit cases – *U.S. v. Cavely*, 318 F.3d 987, 995 (10th Cir. 2003) and *United States v. Soria*, 959 F.2d 855 (10th Cir.1992) – support Defendants' position. Both cases authorized protective sweeps attendant with arrests outside of a residence. Mr. Maese argues that *Cavely* is distinguishable because the suspect admitted he had a friend inside the house. While Mr. Maese made no such admission, this is not the only factor in determining the reasonableness of the search, and other factors in *Cavely* are similar to those here. For example, in *Cavely*,

> The officers also knew that firearms had been found in the house during a prior search. They were just outside of the back door in an area where they could have been vulnerable to an attack from someone inside. There was no evidence that the officers entered the house merely for the purpose of gathering incriminating evidence.

*Cavely*, at 996. These factors were also present here – (1) the officers had information that Mr. Maese possessed firearms even though he was prohibited from doing so by a protective order, (2) the officer were just outside the front door in a vulnerable position, and (3) the body-camera video of the sweep shows it was simply to secure the home, not to search for evidence. *Cavely* allows this Court to consider these factors in evaluating the protective sweep.

Mr. Maese does not even address *Soria*. In this case, the police officers traveled to the arrestee's business, an auto-body shop, and conducted a protective sweep. The Tenth Circuit

noted, "Admittedly at that point in time the authorities did not have a search warrant.  Nonetheless they determined to make a so-called "protective sweep" to make sure there was no person inside who might destroy incriminating evidence or possibly open fire on them."  *Soria*, at 857.  The Tenth Circuit upheld the protective sweep.  There was a much stronger basis for a protective sweep here.  *Soria* did not involve violence, evidence of the presence of firearms, or a suspect that was anti-police.  The suspect also did not ignore police orders and retreat from the doorway multiple time before exiting.  In light of the above, Mr. Maese has failed to carry his burden of "clearly establishing" a Fourth Amendment violation, and, therefore, the individual officers are entitled to qualified immunity.

### C.  Officer Thompson

There is an independent basis for Officer Thompson to be awarded summary judgment.  He did not participate in the protective sweep.  To the contrary, he detained and interviewed Mr. Maese.  Therefore, he cannot be liable for the protective sweep.

### IV.    SUMMARY JUDGMENT IS WARRANTED FOR THE TWO SEARCHES CONDUCTED PURSUANT TO WARRANTS.

The subsequent searches of the home were pursuant to two search warrants issued by Judge McKelvie.  The Fourth Amendment expressly allows searches pursuant to a warrant issued by an independent judge; however, Maese contends Officer Thompson committed a *Franks* violation.  In order to prove a *Franks* violation in a § 1983 case, a plaintiff must prove two things:  (1) plaintiff must show the omitted information was "material" in that its inclusion would have vitiated probable cause for issuing the warrant, and (2) plaintiff must demonstrate that the officer acted with the requisite mental state recklessness in omitting the information. *See Kapinski v. City of Albuquerque*, 964 F.3d 900, 905 (10th Cir. 2020).

### A.  September 25th Warrant

Mr. Maese argues that the September 25th Warrant violated *Franks* because "the officers recklessly omitted the material fact that they had probable cause to charge Adame with Aggravated Burglary, a 2nd degree felony, which would have affected the issuance of the warrant." Dkt. 63, p. 30.  This is incorrect.  Mr. Maese does not contest that the facts contained in the affidavit are sufficient to establish probable cause. Instead, Mr. Maese argues that had the Officer included additional evidence of other crimes, then the Magistrate Judge could have found probable cause. Mr. Maese cites no case law supporting this novel theory.

Furthermore, the facts Mr. Maese claims were omitted were, in fact, included in the Affidavit. Officer Thompson expressly stated in his warrant affidavit:

> Arianna explained she went to Steven's house to confront him and even admitted to striking Steven a few times … Officers also spoke to Steven about the altercation. Steven stated Arianna came to his home and was beating and kicking his door. When he answered the door Arianna came inside and started to hit and kick him. Steven stated he was hit in the face several times and received injuries.  Steven had a cut on the bridge of his nose and the veneer on one of his front teeth was knocked off.  There was also some blood in Steven's mouth but no cut could be located. Steven stated after Adrianna hit him a few times he grabbed her …

Def 796.  Thus, Officer Thompson's warrant affidavit contained both Ms. Adame's and Mr. Maese's description of her attack.  Because of this, there was no *Franks* violation.

Mr. Maese ignores this and appears to argue that Officer Thompson was required to assert the legal conclusion that there was probable cause to charge Ms. Adame.  Mr. Maese cites no law requiring officers to include their legal opinions on probable cause related to criminal charges in a search warrant affidavit.  Even if such law existed, Mr. Maese has not shown that this legal conclusion would have vitiated probable cause or that the omission was sufficiently reckless to

trigger liability under *Franks*.  For each of these reasons, summary judgment is warranted on Mr. Maese's claims related to the September 25th warrant.

### B.  September 27th Warrant

Mr. Maese claims the September 27th warrant violated *Franks* because "the defendants recklessly omitted the material facts that they had no valid reason to perform the protective sweep which resulted in the evidence needed for the warrants to be issued." Dkt. 63, p. 30.  This argument fails for several reasons.  First, as noted in Defendants' motion for summary judgment, the warrant affidavit described the protective sweep in detail:

> During the protective sweep for additional persons in the home, the officers encountered two closets that had firearms in them and a large locked gun safe in the basement of the residence … I reviewed the body worn cameras of two officers and found that video of a shotgun and an AR-15 had been recorded during their protective sweep of the home.  I noted that as they observed the weapons, they verbally warned each other as they observed additional handguns and AR-15 rifles that were not in the camera view.  Defendant is prohibited from purchasing, using, or possessing a firearm or any of the following weapons."  The Protective Order was issued and served to Steven in the courtroom by the Honorable Michael Boehm, on 8/29/2019 (Court case #191800378).

SSM 166-169.  Thus, the information regarding the protective sweep was before the judge when he issued the warrant.  Second, Officer Phillips, the author of the affidavit, was not required to make a legal determination about the legality of the search in the affidavit. Third, Officer Phillips is not a defendant in this case.  Defendants Thompson and Serrano cannot be liable for Sergeant Phillips' search warrant affidavit, and South Jordan could only be liable if it violated the Constitution and was caused by a South Jordan policy or custom.  Fourth, Mr. Maese has not submitted any law requiring officers to include their legal opinions on warrant affidavits, and even if there was law requiring this, Mr. Maese has not submitted any evidence of a policy or custom of such omissions.  Finally, Mr. Maese has not shown that including the omitted legal conclusion

was sufficiently reckless to trigger liability under *Franks*.  For each of these reasons, summary judgment is warranted on Mr. Maese's claims related to the September 27th affidavit.

### C. There are no cases clearly establishing that these searches were unconstitutional.

Even if these warrant-based searches were unconstitutional, Mr. Maese has submitted no cases clearly establishing that the officers' warrant affidavits violated *Franks*.  This is particularly true because Officer Serrano did not submit either warrant affidavit, and Officer Thompson only submitted one of the two warrant affidavits.  Because Mr. Maese has not carried his burden of clearly establishing that Officers Thompson and Serrano violated clearly established law, they are entitled to qualified immunity.

## V.    SOUTH JORDAN CITY IS ENTITLED TO SUMMARY JUDGMENT UNDER *MONELL*.

Mr. Maese argues that there is evidence of a custom of permitting unlawful conduct because no officer has been disciplined for what occurred in this case.  Mr. Maese does not cite any case holding that the violation in the subject incident can amount to a pattern or custom.  In fact, this would contradict black letter law requiring multiple similar incidents to constitute a pattern or custom.  *See Waller v. City and County of Denver*, 932 F.3d 1277, 1287 (10th Cir. 2019) ("Although Mr. Waller has thus alleged one similar prior incident, we have found no cases suggesting that a single prior incident can constitute a "pattern" of conduct giving rise to an inference of deliberate indifference.  To the contrary, we have expressly held that "[o]ne prior incident, even if it was a constitutional violation sufficiently similar to put officials on notice of a problem, does not describe a pattern of violations.").

Next, Mr. Maese seems to argue that because Officers Serrano, Thompson and Kaer's are not aware of any other officer being disciplined for violating another citizen's constitutional rights

means that South Jordan has a custom or policy condoning such conduct. This is not evidence of a policy or custom. It was Mr. Maese's to discover evidence that South Jordan has a policy of custom of permitting officers to violate citizen's constitutional rights. He failed do so.

Mr. Maese next argues that South Jordan had a policy or custom of illegally using an internal police database. This argument fails for multiple reasons. First, Mr. Maese has not made a claim for improper use of a police database. Second, the proper use of a police database is not a constitutional right, and Mr. Maese has not submitted any case law supporting such a right. Second, as noted above, one instance of an improper use is insufficient to establish a policy or custom. Third, Mr. Maese offers no evidence that the use of the database in this instance was improper, let alone unconstitutional. The only evidence Mr. Maese submits on this point is a 5-paragraph affidavit, which addresses the screenshot of Mr. Maese's profile as anti-police and possessing firearms. Nowhere in his affidavit does Mr. Maese assert he is familiar with South Jordan's use of the Spillman system, either in general or in this instance. Nowhere does he state that South Jordan did anything improper. Rather, he states only that he has "seen several demonstrations of Spillman software, and [is] familiar with its usage by my work at Wasatch Constables" and that the note in question "is unattributed. Dkt. 63-1. This evidence does not speak to how that database should and should not be used, what South Jordan's policies and practices concerning that database are, and certainly does not support a custom or pattern of unconstitutional practices by the City.

Because Mr. Maese has failed to submit evidence of a South Jordan custom or policy, and that such a custom or policy caused a constitutional violation in this instance, South Jordan is entitled to summary judgment.

## **CONCLUSION**

For the reasons set forth above, Defendants' motion for summary judgment should be granted.

DATED this 24th day of March, 2023.

**SNOW CHRISTENSEN & MARTINEAU**

 */s/ Scott Young*
Scott Young
*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing **REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was electronically filed with the Clerk of the Court using the CM/ECF system, and electronically served upon Plaintiff counsel this 24th day of March, 2023:

*/s/ Aliza Murad*_____

Legal Assistant
